**<u>NOT FOR PUBLICATION</u>**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| HARCO NATIONAL INSURANCE COMPANY | HONORABLE KAREN M. WILLIAMS |
| Plaintiff, | Civil Action No. 1:25-cv-1927 (KMW-MJS) |
| v. | |
| JAS GROUP ENTERPRISE, INC. *et al.* | |
| Defendants. | **OPINION** |

**Walter Buzzetta, Esq.**
Stradley Ronon Stevens & Young, LLP
457 Haddonfield Road
Suite 100
Cherry Hill, New Jersey 08002

*Counsel for Plaintiff Harco National Insurance Co.*

**Shawn R. Farrell, Esq.**
Cohen Seglias Palls Greenhall & Furman PC
1600 Market Street
Ste 32nd Floor
Philadelphia, PA 19103

*Counsel for Defendants JAS Group Enterprise, Inc., Michael P. Sawyer, and Cathy Sawyer*

**WILLIAMS, District Judge:**

## I.    INTRODUCTION

Plaintiff Harco National Insurance Company ("Plaintiff") brings this action against Defendants JAS Enterprise Group Inc., Michael P. Sawyer, and Cathy Sawyer (collectively "Defendants"), seeking a Preliminary Injunction to obtain collateral pursuant to an Agreement of Indemnity. For the reasons that follow, Plaintiff's Second Motion for Preliminary Injunction (ECF No. 76) will be **GRANTED**.

**II.      BACKGROUND**

This case arises out of alleged violations of an Agreement of Indemnity ("GIA").

Defendants sought surety bonds from Plaintiff for various construction projects, and, in December

2020, as a condition of the agreement, the parties entered into a GIA prior to the issuance of the

bonds. (*See* Compl. at ¶¶ 9-10; Sec. Mot. for Preliminary Inj. at Ex. A). There are two paragraphs

within the GIA that are pertinent to the issue at bar:

> INDEMNITY
> SECOND: The Contractor and Indemnitors shall exonerate, indemnify, and keep indemnified the Surety from and against any and all liability for losses and/or expenses of whatsoever kind or nature . . . and from and against any and all such losses and/or expenses which the Surety may sustain and incur: (1) By reason of having executed or procured the execution of the Bonds, (2) By reason of the failure of the Contractor or Indemnitors to perform or comply with the covenants and conditions of this Agreement or (3) In enforcing any of the covenants and conditions of this Agreement. **The Contractor and Indemnitors shall deposit with the Surety on demand an amount of money or other collateral security acceptable to the Surety, as soon as liability exists or is asserted against the Surety**, **whether or not the Surety shall have made any payment therefor**, **equivalent to such amount that the Surety, in its sole judgment, shall deem sufficient to protect it from loss.**
>
> DISCHARGE AND ADDITIONAL SECURITY
> THIRD: **The Contractor and Indemnitors will, upon the written request of the Surety, promptly procure the full and complete discharge of the Surety from any Bonds specified in such request and all potential liability by reason of such Bonds.**  If such full and complete discharge is unattainable, the Contractor and Indemnitors will, if requested by the Surety, within five (5) business days, place the Surety in funds that are immediately available and sufficient to meet all of the Surety's liabilities that are in force prior to the date of the Surety's demand.  **The Surety may make such demand for funds at any time and without regard to whether it has sustained any loss or received any claim.  The amount of such demand, including reasonable attorney fees and expenses, is at the sole discretion of the Surety.**

> [. . .]
> The Contractor and Indemnitors waive, to the fullest extent permitted by applicable law, each and every right which they may have to contest such payment.  Failure to make immediate payment to Surety as herein provided shall cause the Contractor and Indemnitors to be additionally liable for any and all reasonable costs and expenses, including attorneys fees, incurred by the Surety in enforcing this provision.

(Sec. Mot. for Preliminary Inj. at Ex. A) (emphasis added).  Thereafter, Plaintiff issued a bond to Defendants ("Newark Bond") in connection with the Newark Bond Project with the penal sum of $10,209,870. (*See Id*. at p. 4, Ex. B). The Newark Bond Project required Defendants to replace lead pipes after the City of Newark discovered elevated levels of lead in school drinking water. (*Id*. at p. 4).

On October 2, 2024, Federal prosecutors charged Defendant Michael Sawyer with failing to replace lead service lines, alleging that he committed fraud in the course of completing the Newark Bond Project by failing to replace all lead pipes in certain locations and submitting applications for payment falsely representing that the work was completed.  (*Id*. at p. 5, Ex. C).

On January 23, 2025, Plaintiff sent Defendants a demand letter that requested the full and complete discharge of the three outstanding bonds,[1] and collateral in the amount of $797,358.63. (*Id*. at Ex. C). Defendants did not discharge the bonds as requested. (*Id*. at p. 5, Ex. D).  On March 6, 2025, Plaintiff sent another demand letter requesting collateral in the amount of $13,881,955.14, which represented the full penal amount for all three bonds it had issued to Defendants. (*Id*. at Ex. D). Plaintiff also requested to inspect Defendants' books and records. (*Id*.).

On March 17, 2025, Plaintiff filed the instant action (ECF No. 1)[2], seeking, *inter alia*, to enforce the terms of the GIA. (*See* Compl. at ¶¶ 34-46).  Immediately after filing the Complaint,

---

[1] Plaintiff issued Defendants three separate bonds. The only bond at issue in the Second Motion for Preliminary Injunction is the Newark Bond.
[2] Compl.

Plaintiff filed an Emergency Motion for Preliminary Injunction (ECF No. 2) seeking collateralization of the full penal amount of all three bonds at issue as well as an order providing access to Defendants' financial records. (*See* Compl.; Mot. for Preliminary Inj.).[3] Following briefing and oral argument[4] the Court granted in part and denied in part Plaintiff's Motion for Preliminary Injunction. (ECF No. 18).[5]

In its Order, the Court granted Plaintiff's request for access to Defendants financial records and books under the supervision of Magistrate Judge Skahill, but denied Plaintiff's request to enforce the collateralization provision of the GIA. (*See* ECF No. 19). Regarding collateralization, the Court found that, based on the language in the GIA, there was a likelihood of success on the merits, and that refusal to comply with a contract's collateralization provision constituted irreparable harm. (ECF No. 18 at pp. 9-10). However, the Court also concluded that there was not an *immediate* threat of irreparable harm, which was required for the extraordinary relief sought. (ECF No. 18 at p. 11). The Court explained that, at that time, there had been no default declared on the bonds, nor any liability asserted against the bonds. (*Id.*). Further, the Court observed that, as to the criminal allegations, Defendant was innocent until proven guilty, noting that, especially given the early stage of the criminal proceedings, those allegations could not justify a finding of immediate irreparable harm. (*Id.*). As such, the Court denied Plaintiff's request for collateralization of the full penal amount of the three bonds at issue. (*Id.*).

On May 28, 2025, Plaintiff appealed the Court's Preliminary Injunction Order to the Third Circuit (ECF No. 33). That appeal is still pending.

---

[3] Plaintiff's Motion for Preliminary Injunction (ECF No. 2).
[4] Oral argument was held on April 14, 2025.
[5] Opinion Mot. for Preliminary Inj. (ECF No. 18).

Since the Court's ruling on the Preliminary Injunction, Plaintiff alleges that three significant events have occurred that implicate the immediacy required for injunctive relief. (Sec. Mot. Prelim. Inj. at p. 6). First, on August 21, 2025, JAS was debarred as a contractor in New Jersey based on its alleged fraudulent misconduct during the Newark Bond Project. (*Id.*). Second, on October 8, 2025, Defendant Michael Sawyer was criminally indicted. (*Id.*). Third, on January 16, 2026, the City of Newark filed a civil lawsuit ("Newark Lawsuit") against Plaintiff, Defendant JAS, and Defendant Michael Sawyer. (*Id.*) The claim against Plaintiff in the Newark Lawsuit is based on the Newark Bond. (*Id.*).

After the Newark Lawsuit was filed, Plaintiff issued a demand letter to Defendants seeking collateral in the full penal amount of the Newark Bond, $10,209,870. (*Id.* at p. 7, Ex. H). Defendants have refused to comply with the demand. (*Id.* at p. 7).

On February 20, 2026, given the changed circumstances, Plaintiff filed a Second Motion for Preliminary Injunction (ECF No. 76), seeking such collateral. Defendants opposed the motion (ECF No. 82) on March 2, 2026, and Plaintiff replied (ECF No. 83) on March 16, 2026. The Court scheduled oral argument to be held on Monday, March 23, 2026, to address the Second Motion for Preliminary Injunction (ECF No. 76).

On March 20, 2026, the Friday before the hearing, Plaintiff emailed a letter in advance of oral argument to this Court's chambers.[6] The letter included an affidavit from Plaintiff's forensic accountant that provided an assessment of Defendants' financial records, expressed concerns about those records, and raised concerns about Defendants' transparency with regard to their production of records. Defendants responded by filing a letter (ECF No. 85)[7] on the docket the same day

---

[6] Plaintiff advised that it emailed the letter instead of filing it on the docket because the letter and its exhibits contained confidential information. Defendants' counsel was cc'd on the email.
[7] Defs.' Letter (ECF No. 85).

arguing that Plaintiff's submission was procedurally improper and should be disregarded or stricken. (*See* Defs.' Letter). Defendants also rose, for the first time, a vague jurisdictional argument regarding the pending appeal. (*See Id.*). The Court, upon receiving and reviewing the letters on the morning of the scheduled oral argument, adjourned the March 23, 2026, hearing, granted Defendants leave to respond solely to Plaintiff's affidavit, and rescheduled the hearing for March 25, 2026. (ECF No. 86). Defendants filed a letter brief (ECF No. 87) that addressed the newly raised jurisdictional argument as well as Plaintiff's affidavit.

On March 25, 2026, the Court held oral argument. At the conclusion of the hearing, the Court granted Defendants leave to file a Sur-Reply for the limited purpose of distinguishing caselaw that Plaintiff had attached to its Reply as Exhibit B. (Oral Argument Tr. at pp. 56, 64:16-25). The Court also granted leave for Plaintiff to file a responsive Sur-Sur-Reply. (*Id.*) The Court reserved its decision on the Preliminary Injunction pending the additional briefing. (*Id.*)

On March 30, 2026, Defendants filed a Sur-Reply (ECF No. 90) raising a multiplicity of arguments, some of which pertained to the Exhibit B caselaw, most of which did not. On April 3, 2026, Plaintiff filed a Sur-Sur-Reply (ECF No. 93) and a Motion for Leave to Exceed the Page Limit (ECF No. 92). On April 7, 2026, Defendants filed another letter (ECF No. 94) seeking clarification about the Court's timeline for issuing its ruling on the Second Motion for Preliminary Injunction and retroactively seeking leave to file an overlength brief.

In response to the persistent filings, the Court issued an Order denying the parties' requests to file overlength briefs and advising the parties that it would only consider the papers to the extent that they addressed the Exhibit B caselaw. The Court additionally advised that it would not accept any further argument on the pending Second Motion for Preliminary Injunction. (*See* ECF No. 95).

The Court has now considered all of the parties' submissions, arguments, and letters regarding Plaintiff's Second Motion for Preliminary Injunction, and the Motion is ripe for decision.

## III.    STANDARD OF REVIEW

### A.    Federal Rule of Civil Procedure 65

Pursuant to Federal Rule of Civil Procedure 65, ("Rule 65"), a court may issue a preliminary injunction only upon notice to the adverse party. *See* Fed. R. Civ. P. 65(1). Preliminary injunctions are an "extraordinary remedy, which should be granted only in limited circumstances." *Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014) (quoting *Novartis Consumer Health, Inc. v. Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 586 (3d Cir. 2002)). The primary purpose of preliminary injunctive relief is "maintenance of the status quo until a decision on the merits of a case is rendered." *Acierno v. New Castle Cnty.*, 40 F.3d 645, 647 (3d Cir. 1994). To obtain a preliminary injunction, the moving party must show:

> 1) a reasonable probability of eventual success in the litigation, and
> 2) that it will be irreparably injured . . . if relief is not granted[.] [In addition,] the district court, in considering whether to grant a preliminary injunction, should take into account, when they are relevant,
> 3) the possibility of harm to other interested persons from the grant or denial of the injunction, and
> 4) the public interest.

*Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017) (quoting *Del. River Port Auth. v. Transam. Trailer Transp., Inc.*, 501 F.2d 917, 919-20 (3d Cir. 1974)). The movant bears the burden of establishing the first two, "most critical," factors. *Reilly*, 858 F.3d at 179 (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)). "If these gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.*

7

A preliminary injunction should not be issued where material issues of fact are in dispute. *PRS in Vivo Holdings, Inc. v. Peters*, No. 24-8223, 2024 WL 3995167 (D.N.J. Aug. 27, 2024); *Collick v. Weeks Marine, Inc.*, 397 Fed. App'x 762, 764 (3d Cir. 2010) (preliminary injunction is inappropriate where there is an "abundance of contradictory facts on both sides of the record").

## IV.    DISCUSSION

### A.    The Court's Jurisdiction Pending Appeal of the Initial Preliminary Injunction

In 1982 the Supreme Court made clear that "[t]he filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982). Shortly thereafter, the Third Circuit clarified that "'[d]ivest' means what it says—the power to act, in all but a limited number of circumstances, has been taken away and placed elsewhere." *Venen v. Sweet*, 758 F.2d 117, 120–21 (3d Cir. 1985). Thus, when a party properly appeals a district court's decision to the Third Circuit, the district court no longer has authority regarding the issues that are the subject of the appeal.

However, there are exceptions to the general rule that the district court is divested of authority. *Id*. at 121 n. 2. One such exception is when a district court considers a motion to "modify, restore, or grant injunctions." *Id*. Under Rule 62(c), "[w]hile an appeal is pending from an interlocutory order…the court may suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights." Fed. R. Civ. P. 62. This means that even when an appeal is pending on a preliminary injunction, the district court explicitly retains jurisdiction to suspend, modify, restore, or grant an injunction, as long as it takes steps to "secure the opposing party's rights" such as setting "terms for bond." *Id*.

The Third Circuit has not only affirmed this principle, but has gone so far as to hold that,

8

in certain circumstances, a district court is not bound to maintain the status quo pending an appeal. *See Ortho Pharm. Corp. v. Amgen, Inc.*, 887 F.2d 460, 464 (3d Cir. 1989). In *Ortho Pharm,* the Court explained that Rule 62 does not contain a limitation on the district court's jurisdiction requiring it to preserve the status quo. *Id*. But the Court acknowledged that the district court's authority during the pending appeal is not unfettered. *Id*. The Court explained that a district court retains jurisdiction with regard to modification or institution of a preliminary injunction under Rule 62 when (1) the motion raises new issues not previously decided by the court; (2) changed circumstances arise after the first ruling that justifies new relief; or (3) the relief sought serves to preserve the integrity of the appellate proceedings. *See Id*. at 463.

The Court finds that in this case, the filing of the Newark Lawsuit against Plaintiff based on the Newark Bond constitutes sufficient changed circumstances such that the Court has jurisdiction over the Second Motion for Preliminary Injunction. In the original preliminary injunction, the Court denied collateralization because even though the Court determined that there was irreparable harm, the Court also determined that the harm was not immediate because there was no pending exposure to liability. Now, with liability having been asserted against Plaintiff by the City of Newark *because of the Newark Bond* for the full penal amount of the bond, Plaintiff faces immediate exposure to liability requiring it to defend itself. This directly addresses the Court's original concern.

In *Ortho Pharm*, the Third Circuit found it significant that the district court's original order "indicated that it would "not require [defendant] to submit such distributorship information *at this time*…," thus suggesting that it might be required at some later date." 887 F.2d at 463. (Emphasis in original). Similarly, in its Opinion as to the first Motion for Preliminary Injunction, this Court stated, "to obtain a preliminary injunction, it is the plaintiff's burden to demonstrate a clear

showing of *immediate* irreparable injury, and here, the injury *as articulated* is not plainly immediate..." (Opinion Mot. for Preliminary Inj. at p. 11) (Emphasis added). Just as in *Ortho Pharm*, this Court's holding left open the possibility that should Plaintiff later articulate a clear showing of immediate irreparable harm, the Court could grant an injunctive order enforcing the collateralization provision.

Thus, for the purposes of this Motion, Plaintiff may present, and the Court may consider, factual developments that could transform irreparable harm into *immediate* irreparable harm justifying extraordinary relief. Plaintiff argues, and the Court agrees, that the filing of the Newark Lawsuit against Plaintiff on the basis of the Newark Bond is a change in circumstances that the Court may consider in determining whether there is now immediate irreparable harm. The *Ortho Pharm* court found that the district court retained jurisdiction to consider whether to modify an appealed preliminary injunction when "the situation among the parties and the FDA had been fluid and the circumstances in which [the later] motion was made were arguably quite different than those at the time" of the original order. *Id.* at 464. Similarly, in this case, a significant change in the factual predicate underlying the court's original denial of injunctive relief arose when the evolving criminal investigation and circumstances surrounding the Newark Bond Project resulted in Plaintiff's direct, immediate, and ongoing exposure to liability. Crucially, Plaintiff is now required to expend time, resources, and money defending itself in active litigation that it is only a party to because of the Newark Bond.

Defendants argued in their letter brief, as well as during oral argument, that the issue before the Third Circuit and the issue that Plaintiff presents in its Second Motion for Preliminary Injunction are the same. (ECF No. 87 at p. 1; Oral Argument Tr. at 7:4-25, 8: 1). In essence, Defendants argue that the circumstances have not changed, and that if the Court considers the

Second Preliminary Injunction, it would do so in error. The Court disagrees.

The issue before the Third Circuit is, "Whether an indemnitor's refusal to collateralize a surety pursuant to the terms of a General Indemnity Agreement constitutes immediate and irreparable harm sufficient to warrant injunctive relief in the form of a collateral order." (Defs.' Letter Sur-Reply at p. 1).[8] The issue presented in the instant Motion for Preliminary Injunction is whether a civil lawsuit asserted directly against a surety that is based on the bond at issue constitutes immediate irreparable harm sufficient to warrant injunctive relief in the form of a collateral order when indemnitors refuse to collateralize the surety pursuant to the GIA. These are clearly two different issues. The issue before the Third Circuit is a broad question that seeks to answer a principle underpinning insurance and surety law. The issue presently before this Court is a much narrower question based on the changed circumstances of the parties. If the Court were to answer the question before it now, the issue before the Third Circuit would still be ripe for decision.

Accordingly, under Rule 62 the Court has jurisdiction to decide Plaintiff's Second Motion for Preliminary Injunction.

### B.    Reasonable Probability of Success on the Merits

In its prior Opinion addressing Plaintiff's initial motion for a preliminary injunction, the Court analyzed the applicable factors and concluded that Plaintiff demonstrated a likelihood of success on the merits. Because this action is fundamentally a contract dispute, that determination turned on the Court's interpretation of the GIA in light of the facts then presented.

None of the changed circumstances that have occurred since the Court issued its April 30, 2025, Opinion alters the relevant contractual language or the framework governing its interpretation. Accordingly, the Court will not revisit its prior analysis at length. Instead, the Court

---

[8] Defs.' Letter Sur-Reply (ECF No. 85 at p. 1).

reaffirms its earlier conclusion that Plaintiff has demonstrated a likelihood of success on the merits and briefly summarizes that reasoning below.

In its prior Opinion, the Court concluded that Plaintiff demonstrated a likelihood of success on the merits, which requires only "a reasonable probability, not the certainty, of success." *Aleynikov v. Goldman Sachs Group, Inc.*, No. 12-5994, 2012 U.S. Dist. LEXIS 181852, at \*23-24 (D.N.J. Dec. 14, 2012).

Specifically, the Court found that the Third Paragraph of the GIA imposed an independent and unambiguous obligation requiring Defendants, upon written demand, to procure the discharge of the bonds or provide funds sufficient to cover the surety's potential liability. (Opinion Mot. for Preliminary Inj. at pp. 6-7). The provision expressly permitted the surety to make such a demand "at any time" and "without regard to whether it has sustained any loss or received any claim." (*Id*.).

Further, the Court determined that the Third Paragraph was not conditioned on the existence of a claim or actual loss. (*Id*. at pp. 8-9). By contrast, the Second Paragraph of the GIA, which governed indemnification, expressly required that liability "exist[] or [be] asserted" before indemnification obligations were triggered. (*Id*.). The inclusion of such limiting language in the Second Paragraph, and its absence in the Third Paragraph, demonstrated that the parties did not intend to impose similar preconditions on the surety's right to demand discharge or collateral under the Third Paragraph.[9] (*Id*. at p. 8).

Moreover, the Court rejected Defendants' argument that the Third Paragraph should be read more narrowly based on the alternative provision requiring the posting of funds where

---

[9] The Court acknowledges Plaintiff's argument that the filing of the Newark Lawsuit constitutes a triggering event under the Second Paragraph of the GIA. However, given that Plaintiff has demonstrated a reasonable probability of success on the merits as to the Third Paragraph, the Court need not reach or resolve whether the Second Paragraph is independently satisfied for purposes of the present motion. At this stage, a showing of likely success on any viable contractual basis is sufficient to satisfy this element of the preliminary injunction analysis.

discharge was unattainable. (*Id*.) Instead, the Court found that the GIA granted the surety broad discretion, including the ability to determine the amount of any demand and to pursue remedies until all liabilities were satisfied. The Court found that this structure confirmed that the discharge provision was not limited by existing liabilities but rather operated as a forward-looking risk allocation mechanism.

Finally, the Court noted that Plaintiff's demand was not arbitrary, as it was made after receiving a notice of potential default from the City of Newark. (*Id*. at p. 9). Although such notice was not required to trigger Plaintiff's rights under the Third Paragraph, it provided a good-faith basis for the demand. (*Id*.).

Accordingly, the Court concluded that Plaintiff had demonstrated a likelihood of success on the merits. The Court reaffirms that determination here.

### C.    Irreparable Injury

As with its analysis of likelihood of success on the merits, the Court previously addressed irreparable harm. (*Id*. at p. 9-11). The Court concluded that although Plaintiff demonstrated irreparable harm, it had not, at that time, established the temporal immediacy necessary to warrant extraordinary relief. (*Id*. at p. 11). Whether irreparable harm exists and whether such harm is sufficiently immediate has been the primary focus of Defendants' arguments in its papers as well as during oral argument. As such, the Court will incorporate its prior analysis of irreparable harm[10] but will also elaborate on this finding.

---

[10] For ease of reference, the text of the Court's Opinion regarding Irreparable Harm is as follows:
"The Court notes that, while there are no cases on point that it can find regarding irreparable injury regarding the discharge of bonds, there are more cases that demonstrate that collateralization is not considered a monetary remedy because the collateral reserve prevents the surety from being a "general unsecured creditor," a status which the parties have contracted to prevent. *See Int'l Fid. Ins. Co. v. Anchor Envtl., Inc.*, (E.D. Pa. May 1, 2008); *Westchester Fire Ins. Co. v. Global Real Constr., LLC*, No. 9-207, 2009 WL 137414 at *2 (D.N.J. Jan. 16, 2009); *United States Fid. & Guar. Co. v. Feibus*, 15 F. Supp. 2d 579, 588 (M.D. Pa. 1998). Pursuant to the agreement at bar,

"In order to demonstrate irreparable harm the plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial." *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989). Thus, the "preliminary injunction must be the only way of protecting the plaintiff from harm." *Id*. The harm must be temporally immediate, "not merely serious or substantial, and it must be of a peculiar nature, so that compensation in money cannot atone for it." *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987). The injury alleged must either "threaten the court's ability to decide the case or to give meaningful relief later on." *Delaware State Sportsmen's Ass'n, Inc. v. Delaware Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 197 (3d Cir. 2024), *cert. denied sub nom. Gray v. Jennings*, 145 S. Ct. 1049, 220 L. Ed. 2d 380 (2025). Failure to establish irreparable injury automatically results in denial of a preliminary injunction. *Instant Air Freight Co.*, 882 F.2d at 800.

### 1.    Refusal to Collateralize as Irreparable Harm

Plaintiff argues that Defendants' failure to collateralize it pursuant to the GIA constitutes irreparable harm. Defendants disagree, arguing that Plaintiff's asserted harms are speculative, economic in nature, and compensable through monetary damages at the conclusion of litigation. (Defs.' Opp. at p. 13-15).[11]

---

discharge is an alternative contractual remedy to prevent Plaintiff from becoming a general creditor to Defendants. *See* Mot. for Preliminary Inj. at Ex. A at ¶ 3.

Similarly, while there are no cases on point that relate specifically to discharge as the specific performance requested, "courts have routinely granted specific performance to enforce collateral security provisions, specifically where no conditions precedent to providing collateral funds exist other than the surety's demand for reserves pursuant to an explicit provision in an indemnity agreement." *XL Specialty Ins. Co. v. Interstate Indus. Corp.*, No. 9-82, 2009 WL 2568077 at *3 (D.N.J. Aug. 18, 2009). Here, discharge pursuant to the GIA also has no conditions precedent to providing discharge other than the surety's demand. *See* Mot. for Preliminary Inj. at Ex. A at ¶ 3.

Given that the intent of the discharge provision is to protect the surety from the same harm as the collateral provision, and the discharge provision itself is clear and unambiguous, with no conditions precedent other than the demand of the surety to invoke the remedy sought, the Court finds that comparable treatment of the discharge provision is warranted." (Opinion Mot. for Preliminary Inj. at pp. 9-11).

[11] Defs.' Opp. to Sec. Mot. for Preliminary Inj. (ECF No. 56 at pp. 13-15).

Collateralization, however, is not a form of monetary relief. Courts in the Third Circuit have recognized that "[b]y providing bonds to the principal, the surety is exposed to risks of claims against the bonds" and is therefore "potentially liable for the claims and the penal sums of its bonds." *Int'l Fid. Ins. Co. v. Anchor Env't, Inc.*, No. CIV.A. 07-04750, 2008 WL 1931004, at *7 (E.D. Pa. May 1, 2008). To mitigate that exposure, a surety may bargain for a collateral security provision. *Id*. Unlike monetary damages, collateral "is merely a trust fund to be held by the surety and must be repaid to the principal in the event that damages are reduced or not awarded." *Id*. (citing *U.S. Fid. & Guar. Co. v. Feibus*, 15 F. Supp. 2d 579, 588 (M.D. Pa. 1998), *aff'd,* 185 F.3d 864 (3d Cir. 1999).).

This distinction is critical. Monetary relief compensates a plaintiff for loss, entitling the plaintiff to collect and retain a monetary award. *Guarantee Co. of N. Am. USA v. SBN Enters., Inc.*, No. CIV.A. 09-5399 JAP, 2011 WL 3205318, at *4 (D.N.J. July 27, 2011). Collateralization, by contrast, does not compensate a surety at all. Instead, it preserves the status quo by enforcing the surety's bargained-for protection by ensuring that it need not expend its own funds to satisfy obligations undertaken on behalf of the indemnitor. *Id*. In the event that the collateral exceeds the funds required to uphold the indemnitor's agreements, the surety relinquishes those funds back to the indemnitor. *Anchor Env't, Inc.,* 2008 WL 1931004, at *7. If the surety were denied this bargained-for protection, even if it was reimbursed after trial, those post litigation damages cannot remediate the loss of the agreed upon protection. That is because a collateral security provision is designed to insulate a surety from having to rely on its own assets or credit to satisfy an indemnitor's potential obligations. *U.S. Fid. & Guar. Ins. Co. v. Cler Const. Servs., Inc.*, 2003 WL 1873926, at *2 (N.D. Ill. Apr. 11, 2003). Delaying enforcement of collateralization until the conclusion of litigation defeats the purpose of the provision because it deprives the surety of the

15

very protection it bargained for. *First Indem. of Am. Ins. Co. v. Kemenash*, 744 A.2d 691, 699 (App. Div. 2000) (explaining that "the surety generally is not interested in obtaining a judgment against the indemnitor for a sum certain when it institutes suit upon incurring a liability. Rather, its interest is to secure the benefit of the indemnitor's promise to post collateral sufficient to cover the surety's anticipated future losses."). As such, monetary damages at the end of litigation cannot restore that protection. *Id*. At that point, the protection is forever lost.

Further, this bargained for protection is central to the surety's business. When a surety issues a bond on condition of indemnification, it does so with the understanding that its own resources will not be conscripted to cure an indemnitor's defaults. *Cler Const.*, 2003 WL 1873926, at *2. That expectation is not abstract; it informs how the surety allocates capital, evaluates risk, and determines whether, and on what terms, to issue bonds going forward.[12] A collateral security provision ensures that the surety's assets remain unencumbered and are not diverted in the future to cover obligations it agreed to secure only when such security was based on the condition that the indemnitor would bear the ultimate financial burden for defaults. The collateral provision ensures that the indemnitor, not the surety, bears the financial burden of potential liability.

---

[12] Surety bonds are issued only after a "rigorous vetting process to determine how much, if any, bond capacity a surety is willing to extend." *Surety bond underwriting*, 5 Bruner & O'Connor Construction Law § 12:11 n. 3. The underwriting process requires a determination of whether a contractor is "likely to be able to perform the obligation for which the surety is to become secondarily liable." *Surety contracts distinguished from insurance contracts*, 4 Bruner & O'Connor Construction Law § 11:5. This "vetting process" involves evaluating various factors—such as a contractor's finances, experience of personnel, and managerial capabilities—in relation to the contractor's ability to perform the specific job for which a bond is sought. *Id*. "As a normal feature of the underwriting process, a surety will require the contractor to indemnify the surety against loss. In other words, surety bonds are not intended to protect the party who is the subject of the underwriting inquiry (e.g., [the] contractor)." *Id*. This extensive, individualized risk evaluation process reflects a surety's "theoretical expectation that the principal will perform its contract and that the surety will not suffer a loss." 11 *New Appleman on Insurance Law Library Edition* § 146.05. Under this framework, "[n]o risk is shifted away from the principal. The principal is and remains primarily liable for the bonded obligation." *Id*. Because the surety's potential loss is thus contractually allocated to the principal, the surety does not operate on a model of expected loss but instead conducts its underwriting and claims-handling decisions in reliance on bargained for indemnification. *Hutton Const. Co. v. Cnty. of Rockland*, 1993 WL 535012 at *10 n. 9 (S.D.N.Y. Dec. 22, 1993), *aff'd,* 52 F.3d 1191 (2d Cir. 1995) (explaining that a surety relies on indemnity agreements "for all bonds which it executes.")

When an indemnitor refuses to collateralize a surety, that financial burden shifts in a manner that can affect the surety's ongoing and future business operations—consequences that cannot be adequately remedied with monetary damages at the conclusion of litigation.

Finally, collateralization is intended to eliminate the risk of insolvency exposure by preventing the surety from being reduced, at the conclusion of litigation, to the status of an unsecured creditor competing with others for recovery. *Anchor Env't, Inc.,* 2008 WL 1931004, at *7. To that end, sureties bargain for the right to secure funds in advance, before they are required to pay claims and before they even become creditors. *Id*. In bargaining not only for indemnification, but also for collateralization, a surety effectively shifts its potential future liability so as to avoid becoming a creditor at all.

A refusal to collateralize upends that premise. It forces the surety into the very role the agreement was designed to avoid, transforming the surety from a secured, risk-avoiding party into a creditor, and potentially an unsecured one at that. That shift in position is not merely financial; it alters the nature of the parties' relationship and deprives the surety of the protection for which it bargained. This pre-loss protection cannot be recreated through a post-judgment damages award.

### 2. Plaintiff's Reliance on Cases Related to Collateralization

At oral argument, Defendants argued that courts have only found it appropriate to order collateralization at later stages of litigation, such as at summary judgment after the parties have engaged in discovery. Defendants further argued that courts have only found collateralization appropriate where the amount of collateral is supported by a clear showing of existing economic injury or a demonstrated danger of insolvency or dissipation of assets. In response, Plaintiff pointed to Exhibit B of its Reply, which compiled twelve cases from around the country that stood for the proposition that district courts grant preliminary injunctions enforcing collateralization

17

provisions when an indemnitor refuses to collateralize a surety ("Exhibit B Caselaw"). Defendants were not prepared to address those cases during oral argument but vociferously contended that they were "very factually distinguishable" from this case. (Oral Argument Tr. at 56:1-9). Accordingly, the Court granted Defendants leave to file a sur-reply limited to distinguishing the Exhibit B Caselaw. (*See* Oral Argument Tr. at pp. 56, 64:16-25; *see also* ECF No. 95).

In its sur-reply, Defendants raised a myriad of arguments, most of which were outside of the limited scope of distinguishing the Exhibit B Caselaw.[13] The Court considers only those arguments that specifically address the Exhibit B Caselaw.[14] In that regard, Defendants continue to argue that courts only grant injunctive relief enforcing collateralization in specific factual circumstances. Plaintiff responds that courts have enforced collateral provisions at the preliminary injunction stage based on asserted claims, estimates of exposure, or circumstances in which the surety's loss was not yet ascertainable.

Upon independent review of the Exhibit B Caselaw, the Court did not find that the cited authorities imposed any single, mandatory factual prerequisite to grant injunctive relief. Unsurprisingly, the facts of each case varied. In some cases, a surety had taken over performance

---

[13] In Section III of their sur-reply, Defendants attempted to distinguish twelve (12) cases: five (5) cases from Exhibit A, five (5) cases from Exhibit B, and one (1) case that was not attached to either Exhibit A or Exhibit B. (Defs.' Sur-Reply at pp. 10-14). The Court will only consider Defendants' arguments that address the Exhibit B caselaw. The Court also notes that Defendants attempted to distinguish *Liberty Mutual Insurance Co. v. DeVere Construction Co., Inc.*, 2016 WL **4800796** (E.D. Mich. 2016) (emphasis added). However, this opinion was not attached to Exhibit B. Instead, Exhibit B included *Liberty Mut. Ins. Co. v. DeVere Const. Co., Inc.*, 2016 WL **3269453** (E.D. Mich. 2016) (emphasis added). Both opinions arise from the same case. However, the opinion that Plaintiff attached to Exhibit B addressed a preliminary injunction enforcing a surety's collateral provision of an indemnity agreement. The opinion that Defendants cited addressed a motion for reconsideration of the preliminary injunction. These procedural postures, clearly, impose different standards on different parties that require the court to examine different factors. As such, the Court cannot consider Defendants' arguments regarding *DeVere Construction* as applicable to the Exhibit B caselaw.

[14] The caselaw from Exhibit B that Defendants' Sur-Reply attempts to distinguish includes: *Great American Insurance Co. v. SRS, Inc.,* 2011 WL 6754072 (M.D. Tenn. 2011); *United States Fidelity and Guaranty Company v. J. United Electrical Contracting Corp.*, 62 F.Supp.2d 915 (E.D.N.Y. 1999); *XL Specialty Insurance Co. v. Bighorn Construction & Reclamation, LLC,* 2022 WL 2105925 (D. Md. 2022); *Allied World Specialty Insurance Company v. Lawson Investment Group, Inc.*, 2016 WL 695980 (M.D. Fla. 2016); *International Fidelity Insurance Company v. Anchor Environmental, Inc.*, 2008 WL 1931004 (E.D. Pa. 2008).

18

of the contractor's projects and had begun to pay obligations under the bond. *See Great American Insurance Co. v. SRS, Inc.,* 2011 WL 6754072 (M.D. Tenn. 2011). In other cases, "obligations under the bonds [were] continuing" and "the total loss to the Sureties [was] not yet ascertainable." *United States Fidelity and Guaranty Company v. J. United Electrical Contracting Corp.*, 62 F.Supp.2d 915, 923 (E.D.N.Y. 1999); *see also XL Specialty Insurance Co. v. Bighorn Construction & Reclamation, LLC,* 2022 WL 2105925 at *7 (D. Md. 2022). In *J. United Electrical*, the court ordered collateral in an unspecified amount, directing the plaintiff to submit a proposed order. *J. United Electrical Contracting Corp.*, 62 F.Supp.2d at 918, 927. In *Bighorn Construction*, the court explained that collateral is reasonable when it "is commensurate with…the amount sought by a third party in litigation." *Bighorn Construction*, 2022 WL 2105925 at *8. These cases illustrate that courts have granted injunctive relief across a range of factual scenarios including where liability is ongoing, disputed, or not yet fixed.

What is consistent across these cases, is not a particular factual predicate as Defendants advance, but the reasoning courts applied. To wit, these courts repeatedly concluded that a surety suffers irreparable harm when it is deprived of its bargained-for collateral security and thereby exposed to the risk of becoming a general unsecured creditor. *Anchor Enviro.*, 2008 WL 1931004 at *7. ("If Plaintiff is deprived of the bargained-for collateral security, it will face the risk of being a general unsecured creditor of Defendants and not being able to collect."); *J. United Electrical Contracting Corp.*, 62 F.Supp.2d at 923 ("Furthermore…the defendants' breach of the collateral security clause will result in immediate harm since the Sureties risk being deprived of bargained-for collateral and becoming a general unsecured creditor."); *Bighorn Construction*, 2022 WL 2105925 at *9 ("the nature of the injury is not simply monetary. Rather, the harm amounts instead to the failure…to perfect [a] security interest. This security interest would otherwise be lost absent

19

specific performance which is achieved by granting the requested injunctive relief.") (cleaned up); *SRS, Inc.,* 2011 WL 6754072 at \*8 (quoting *Anchor Environmental*, 2008 WL 1931004 at \*7. ("To protect [the surety] from becoming a general creditor, the grant of specific performance to enforce the collateral security provision is warranted.")); *Allied World Specialty Insurance Company v. Lawson Investment Group, Inc.*, 2016 WL 695980 at \*4 (M.D. Fla. 2016) (finding irreparable harm where the surety "'risk[s] being deprived of bargained-for collateral and becoming a general unsecured creditor.'") (cleaned up).

Thus, while Defendants correctly state that the facts in the Exhibit B Caselaw are distinguishable from those in the present matter, that observation does not advance their arguments, because the facts of those cases are not only distinguishable from this case, but from one another as well. Contrary to Defendants' contentions, this collection of cases does not reflect a requirement that a surety first incur actual loss, establish a fixed amount of damages, or prove dissipation of assets before obtaining relief. Instead, these cases show that even across differing factual circumstances, courts applied the same core principle: the denial of bargained-for collateral security constitutes irreparable harm because it deprives the surety of its contractual protection and exposes it to the risk of unsecured creditor status.

### 3. Immediacy of Irreparable Harm

To satisfy the preliminary injunction standard, a court must find not only that a party will suffer irreparable harm, but also that that harm will be immediate. *ECRI*, 809 F.2d 223 at 226. The mere risk of injury is insufficient because "the moving party must establish that the harm is imminent and probable." *Instant Air Freight*, 882 F.2d at 801. The temporal immediacy standard specifically prohibits injunctions based on harm that may occur "only in the indefinite future." *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 91 (3d Cir. 1992). Instead, courts require

20

evidence that there is a "presently existing actual threat" because an injunction "may not be used to simply eliminate a possibility of remote injury, or a future invasion of rights." *Cont'l Grp., Inc. v. Amoco Chemicals Corp.*, 614 F.2d 351, 359 (3d Cir. 1980).

The Court previously found that Plaintiff's risk of irreparable harm was not immediate. (*See* Opinion Mot. for Preliminary Inj. at p. 10-11). In its first Motion for Preliminary Injunction, Plaintiff argued that there was immediate irreparable harm because Defendants refused to deposit collateral and to provide Plaintiff with access to their financials as required under the GIA. Plaintiff also pointed to the existence of a criminal complaint against Defendants arising out of the Newark Bond Project. The Court determined that those facts alone were not sufficient to establish *immediate* irreparable harm and denied Plaintiff's request to enforce the GIA's collateral provision. The Court found that, at that time, Plaintiff faced only the possibility of future exposure.

Plaintiff now argues that circumstances have evolved such that there is an immediate danger of irreparable harm. Plaintiff points to Defendant JAS's debarment as a contractor in New Jersey, the criminal indictment of Defendant Michael Sawyer, and the Newark Lawsuit as new facts that satisfy the temporal immediacy required to justify injunctive relief. Defendants contend that these facts are not "significant developments." (Defs. Opp. at p. 6). Instead, Defendants argue that "[t]hese events are procedural outgrowths of the same unproven allegations this Court previously considered, and they do not transform disputed claims into fixed, ascertainable liability." (*Id*. at p. 7). Defendant's argument is not persuasive.

While prior allegations of Defendants' misconduct may have suggested that Plaintiff could eventually be exposed to liability, those criminal allegations did not require Plaintiff to immediately defend a live claim against it. The Newark Lawsuit does. Unlike the earlier criminal proceedings, which did not impose or even assert liability against Plaintiff, the Newark Lawsuit

affirmatively alleges that Plaintiff is liable based on the Newark Bond and places the full penal amount at issue. In short, rather than having to merely contend with the potential downstream consequences of Defendants' alleged misconduct, Plaintiff now faces an active civil lawsuit alleging liability directly against it. Despite this exposure, Defendants continue to refuse to collateralize Plaintiff, maintaining that Plaintiff's assertions of immediate irreparable harm are overstated and remain speculative. Moreover, despite the Court's prior Order requiring review of Defendants' financial condition, that process, now ongoing for over a year, has been contentious, protracted, and has failed to provide meaningful clarity regarding the indemnitors' financial positions.

These circumstances create two forms of present exposure: (1) immediate litigation exposure to liability on the bond, and (2) the concurrent risk that, if liability is imposed, Plaintiff will be unable to recover from Defendants due to the absence of collateral. It is the combination of these risks that renders the harm immediate.

Defendants' contention that the threat is not immediate because litigation is still in its early stages is unpersuasive. Even if Defendants were to prevail in the pending Newark Lawsuit, Plaintiff must still expend resources to defend itself. While Defendants advance various substantive legal theories under which they may succeed in the Newark Lawsuit, those theories are simply that: theories to argue before a different court about a different case at a different time. In *this* matter, none of those theories remove the risk that Plaintiff now faces despite having bargained for pre-loss protection from precisely this type of risk. This is not the amorphous speculation that Defendants frame it to be. Plaintiff has now been sued under the bond and faces potential liability for the full penal amount. This is a presently existing threat requiring Plaintiff's immediate consideration and action.

22

As such, the Court finds that Plaintiff has established immediate irreparable harm.

### D.        Balance of Hardships

Since Plaintiff has established the two "most critical" factors—likelihood of success on the merits and immediate irreparable harm—the Court must now weigh all four factors together. *Nken*, 556 U.S. at 434. The balance of hardships factor requires district courts to "balance the harm that will occur to the moving party from the denial of the preliminary injunction with the harm that the non-moving party will incur if the injunction is granted." *Power Surv., LLC v. Premier Util. Servs., LLC*, 61 F. Supp. 3d 477, 487 (D.N.J. 2014) (quoting *Hybritech Inc. v. Abbott Lab'ys*, 849 F.2d 1446, 1457 (Fed. Cir. 1988).). Courts must first "identify the harm to be caused by the preliminary injunction" and then weigh that harm "against the possibility of the harm caused by not issuing it." *B.L. by Levy v. Mahanoy Area Sch. Dist.*, 289 F. Supp. 3d 607, 615 (M.D. Pa. 2017).

Here, the Court cannot ignore that the collateral sought exceeds $10,000,000. That is an exceedingly large sum, and the Court recognizes that issuing such an Order would impose a significant burden on Defendants. Defendants argue that this burden weighs against injunctive relief, particularly where Plaintiff's harm remains speculative and Plaintiff voluntarily assumed the risks associated with issuing the Newark Bond. However, the Court must also be mindful that "harm which follows a defendant who willfully breaches a contractual undertaking is not a basis for denying a preliminary injunction." *GPI, LLC v. Patriot Goose Control Inc.*, No. CV2320953MASTJB, 2024 WL 1704731, at *8 (D.N.J. Apr. 18, 2024), *appeal dismissed*, No. 24-1729, 2024 WL 4648160 (3d Cir. Apr. 30, 2024).

The burden on Defendants would not be one created by the injunction itself, but rather one that arises from Defendants' own contractual undertakings. The amount of collateral Plaintiff seeks corresponds directly to the liability asserted against it in the Newark Lawsuit. So, while the Court

acknowledges that the amount is substantial, and the burden may be heavy, it cannot conclude that it is unreasonable or undue. *See Bighorn Construction*, 2022 WL 2105925 at *8.

Simply stated, when a party's hardship is the predictable consequence of its own contractual breach, the balance of equities does not favor denying relief "even where it causes a loss of business." *Id*. As such, Defendants' argument that the burden would be too heavy and the consequences too great, cannot justify the denial of injunctive relief.

More fundamentally, Defendants' argument that Plaintiff voluntarily assumed the risks associated with issuing the bonds ignores the express allocation of risk set forth in the GIA. Plaintiff assumed the risks associated with issuing the Newark Bond only after Defendants signed the GIA, which mitigated, if not altogether eliminated, those financial risks. The purpose of that agreement was to *allocate the financial risks to the Defendants* in the event that claims were asserted under the bonds. It is Defendants, not Plaintiff, that now attempt to shift the risk they voluntarily assumed when entering into an indemnification agreement that clearly and unambiguously required them to indemnify and collateralize Plaintiff upon demand. Plaintiff issued the bond expecting that if the very risk it now faces were to materialize, it would be indemnified and collateral secured. Enforcing that risk allocation does not shift risk; it gives effect to the parties agreed-upon arrangement. An injunction would not impose a new obligation, rather it would compel performance of an already existing one.

Accordingly, the Court finds that the balance of hardships weighs in Plaintiff's favor.

### E.    Public Interest

Finally, the Court must examine whether public interest is impacted by the issuance or denial of the preliminary injunction. Plaintiff argues that public interest favors enforcement of indemnity agreements in the surety context because such enforcement promotes stability and

reliability in public construction projects. Defendants argue that granting the requested relief could have broader consequences by chilling commercial activity, particularly in the construction industry, where contractors may face significant financial burdens if required to post collateral before liability is established.

This case arises from a public works project in which Defendants contracted with the City of Newark to replace lead pipes after Newark discovered high levels of lead in school drinking water. The Newark Project, on its face, was undertaken to ensure public safety. Undoubtedly, the public has an interest in "seeing that the contractors on public works projects use contract funds to perform the work." *Anchor Env't*, 2008 WL 1931004, at *7. Through that lens, it is abundantly clear that "issuance of a preliminary injunction furthers the public interest by recognizing and enforcing the plain language of a binding surety indemnification agreement" between a public works contractor and the surety that issues a bond guaranteeing that work. *Id*.

More broadly, enforcement of surety indemnity agreements supports the integrity of the public contracting system by ensuring that sureties can rely on the protections for which they bargained when issuing the bonds. Those protections, including the right to collateralization, are central to how sureties assess risk, allocate capital, and determine whether to issue bonds in the first instance.

Defendants' concern that enforcement of such agreements may chill commercial activity is misplaced. To the contrary, rather than inhibiting commercial activity, enforcement of contractual obligations promotes predictability and confidence in commercial relationships, enabling parties to contract freely, assured that they can rely on the terms of the agreement to be enforced as intended.

Therefore, the Court finds that this factor weighs in favor of Plaintiff.

25

**V.    CONCLUSION**

As the court has determined that all factors weigh in Plaintiff's favor for all of the reasons set forth above, Plaintiff's Second Motion for Preliminary Injunction (ECF No.  76) is **GRANTED**. An Order consistent with this Opinion will be entered.

Dated:  May 7 , 2026

KAREN M. WILLIAMS
United States District Judge